UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
5:20-cv-00152-KDB
(5:15-cr-00073-KDB-DCK-3)

| | |
|---|---|
| **CARLOS ANTONIO FLORES,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | |
| vs. ) | **ORDER** |
| ) | |
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Respondent.** ) | |
| ) | |

**THIS MATTER** is before the Court on Petitioner's Pro Se Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255 [CV Doc. 1],[1] Petitioner's Pro Se "Motion for Time Bar and Equitable Tolling by the Government" [CV Doc. 4], and the Government's Motion for Leave to File an Exhibit [CV Doc. 9].

**I.     BACKGROUND**

    **A.     Offense Conduct**

Petitioner Carlos Antonio Flores ("Petitioner") participated in an organization that distributed large quantities of high-purity methamphetamine in western North Carolina. [See CR Doc. 291 at ¶ 5: Presentence Investigation Report (PSR)]. Jose Duanes-Intriago ("Duanes") recruited Petitioner into his drug-trafficking organization in October 2014. [CR Doc. 294 at 154-55: Trial Tr.]. Petitioner obtained methamphetamine from Duanes and delivered it to Duanes'

---

[1] Citations to the record herein contain the relevant document number referenced preceded by either the letters "CV," denoting that the document is listed on the docket in the civil case file number 5:20-cv-00152-KDB, or the letters "CR," denoting that the document is listed on the docket in the criminal case file number 5:15-cr-00073-KDB-DCK-3.

customers in several counties in Western North Carolina. Petitioner collected money for the drugs. [CR Doc. 294 at 156-58, 198-99, 219]. During the year that Petitioner worked with Duanes, Petitioner participated in trafficking 15 to 20 kilograms of methamphetamine for approximately $400,000.00. [CR Doc. 294 at 158].

Petitioner regularly received and distributed drugs in an apartment that he shared with Juan Ernesto Ortiz-Rodriguez ("Ortiz") in Statesville, North Carolina. [CR Doc. 294 at 159-61, 166-69, 200-01]. Duanes also picked up money from Petitioner at that location. [CR Doc. 294 at 201-02, 211-12]. Duanes kept methamphetamine in two cat litter boxes at the apartment. [CR Doc. 294 at 159-61, 166-69, 200-02]. Each box contained 30 ounces of methamphetamine. [CR Doc. 294 at 166-69].

Ritchie Shook, another methamphetamine dealer, was a regular customer of Petitioner and Duanes, who often fronted methamphetamine to Shook. [CR Doc. 294 at 82-89, 159]. In the summer and fall of 2015, the two men sold Shook at least 130 ounces of methamphetamine. [CR Doc. 294 at 89-90, 100-01].

On October 30, 2015, Duanes directed one of his couriers to pick up one of the cat litter boxes from Petitioner at his apartment and deliver it to Shook. [CR Doc. 293 at 17-18: Trial Tr.; CR Doc. 294 at 161-62, 165-66]. Unbeknownst to Duanes, the courier was working with law enforcement as a confidential informant ("CI"). [CR Doc. 293 at 14]. Police equipped the CI with an audio recorder and gave him $8,000.00 to buy an additional 10 ounces of methamphetamine from Petitioner. [CR Doc. 293 at 19, 47, 50-53; CR Doc. 294 at 54-55]. The CI went to the apartment and picked up one of the cat littler boxes containing methamphetamine. [CR Doc. 293 at 17-18, 55-56]. The CI also arranged to buy additional methamphetamine from Petitioner. [CR Doc. 294 at 54-55].

Shortly after Petitioner's transaction with the CI, police watched Petitioner and Ortiz leave their apartment in a green Buick. [CR Doc. 293 at 17-18; CR Doc. 294 at 12-13, 33]. Officers stopped the car and recovered, among other things, the cash that they had previously provided to the CI. [CR Doc. 294 at 13, 16, 35, 37-38, 53-54]. The officers arrested Ortiz and Petitioner, who had $2,000.00 and a small amount of methamphetamine in his pocket. [CR Doc. 293 at 19-20; CR Doc. 294 at 16]. The CI delivered the cat litter box containing methamphetamine to Shook, who gave it to Davey Yang, a co-conspirator to resell. [CR Doc. 294 at 92-94]. Police arrested Yang and recovered the cat litter box containing methamphetamine from his car. [CR Doc. 293 at 73-74, 97].

### B. Criminal Proceedings

In November 2015, Petitioner was indicted by a grand jury. [CR Doc. 50: Bill of Indictment]. Attorney Scott Gsell was appointed to represent Petitioner. [11/2/2015 Docket Entry]. On April 12, 2016, Gsell filed a motion for inquiry of counsel stating that Petitioner had advised him that he was not satisfied with Gsell's services and wanted a new attorney. [CR Doc. 131]. Following a hearing, the Magistrate Judge denied the motion, finding no basis for removal of Gsell. [CR Doc. 134]. In April 2016, a grand jury issued a First Superseding Bill of Indictment. [CR Doc. 136].

On July 19, 2016, Petitioner was charged in a Second Superseding Bill of Indictment with one count of methamphetamine trafficking conspiracy in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count One) and one count of possession with intent to distribute methamphetamine and aiding and abetting the same in violation of 21 U.S.C. §§ 841(a)(1) and 18 U.S.C. § 2 (Count Two). [CR Doc. 183: Second Superseding Indictment]. On both counts, the Second Superseding Indictment charged that 500 grams or more of a mixture and substance containing a detectable

3

amount of methamphetamine and 50 grams or more of actual methamphetamine were reasonably foreseeable by Petitioner; thus, 21 U.S.C. § 841(b)(1)(A) applied. [Id. at 1-2].

The day before the Second Superseding Indictment was filed, Petitioner filed a pro se motion for inquiry of counsel. [CR Doc. 185]. Petitioner asserted that Gsell had provided ineffective assistance "by applying force to the petitioner to sign an [ill-]advised plea," including signing away his rights under the Freedom of Information Act and providing assistance to the United States after "I made clear I wouldn't assist at all, most importantly, because I know nothing of or about these charges." [Id. at 2]. Petitioner also claimed that he felt that he was "being threatened or being forced to plea out because of a 2[-]level weapon enhancement" and two-level role enhancement, even though he never had a gun. [Id. at 3]. Following a hearing on July 27, 2016, the Magistrate Judge allowed Gsell to withdraw and appointed attorney Roderick Glenn Davis to represent Petitioner. [7/27/2016 & 8/2/2016 Docket Entries].

Two days after Davis was appointed, he filed a motion to continue the trial, stating he had not had adequate time to "meet Mr. Flores; review facts; review the discovery materials; discuss possible defenses; and inform Mr. Flores of the possible maximum punishments under the United States Sentencing Guidelines." [CR Doc. 192]. The Court granted the motion [CR Doc. 193] and entered to subsequent order continuing the case on its own motion. [CR Docs. 210, 233].

Davis engaged in extensive plea negotiations with the United States. [See CV Docs. 5-1, 5-2]. In January 2017, the Government offered multiple plea agreements to Petitioner. [See CV Doc. 9 at ¶ 2]. In the last plea agreement offered to Petitioner, the Government agreed to dismiss Count Two if Petitioner agreed to plead guilty to Count One. [CV Doc. 9-1 at ¶¶ 1-2, 4]. The statutory maximum sentence on Count One would have been 20 years, 21 U.S.C. § 841(b)(1)(C).

[Id. at ¶ 4]. Under this plea deal, the parties agreed to jointly recommend the following as to the U.S.S.G.:

> a. The amount [of] methamphetamine (actual) that was known to or reasonably foreseeable by the [Petitioner] was at least fifty (50) grams. The parties reserve their right to advocate what the specific amount of methamphetamine (actual) was known to or reasonably foreseeable by the Defendant and whether he should receive a base offense level of 30 or more.
>
> …
>
> c. **The parties agree that either party may argue their respective positions regarding other specific characteristics, cross-references, special instructions, reductions, enhancements, adjustments, departures, and/or variances to the "applicable guideline range" (U.S.S.G. § 5C1.1)**.
>
> d. The United States will not oppose a sentence at the bottom end of the applicable guideline range determined by the District Court.

[CV Doc. 9-1 at ¶ 7 (emphasis added)]. As such, under the final plea deal offered to and refused by Petitioner, the parties would have reserved their right to argue their respective positions regarding any enhancements at sentencing.

On January 20, 2017, Davis advised the prosecutor, "I have reviewed the new plea agreement with Mr. Flores. Please give me some additional time to specifically explain the difference in the previous plea offers." [CV Doc. 5-1]. On January 26, 2017, Davis emailed the prosecutor stating, "Mr. Flores will sign the right now plea [*sic*]" if certain changes were made to the factual basis. [CV Doc. 5-2 at 1]. Davis noted, "I have never attempted to negotiate a plea offer this many times." [Id.]. Although the prosecutor changed the factual basis as requested, see id., Petitioner did not accept the plea offer. Instead, he chose to proceed to trial.

At trial, the Government presented testimony from various members of the drug trafficking conspiracy, including Duanes, Shook, and Yang, as well as evidence from law

5

enforcement officers. [See CR Docs. 293, 294]. Christopher Pitts, a Detective Sergeant with the Iredell County Sheriff's Narcotics Division, testified that he was working with the CI on October 30, 2015, and that he arranged and monitored the controlled buy. [CR Doc. 293 at 49-51]. Pitts identified the recordings from the wire worn by the CI during the controlled buy. [Id. at 51-52]. Davis objected, arguing that the CI was not going to be testifying and that the conversation would be hearsay and violate the Confrontation Clause. [Id. at 52-53]. The prosecutor responded that Pitts was testifying about what he heard on the recording. [Id. at 53]. The Court overruled the objection. [Id.]. Pitts testified that parts of the recording were very difficult to hear and that the recorder had failed at some point while the CI was in the apartment. [Id. at 53-54]. Pitts testified that he heard the CI speaking to someone and saying that person's name, "Carlos," many times. Id. at 54-55. Pitts, who had been conducting surveillance on the outside of the apartment building, followed the CI to the debriefing location, where the cat litter box was found in the back of the CI's car. [Id. at 55]. On cross-examination, Pitts admitted that "the only day this entire investigation that Mr. Flores was on [his] radar screen [was] October 30th." [Id. at 60].

Shook testified that Petitioner and Duanes had threatened him in the fall of 2015 when he sought to get out of the methamphetamine trafficking business. [CR Doc. 294 at 90]. Duanes admitted that he threatened Shook. [Id. at 163]. On cross-examination, Duanes testified that Petitioner had not threatened Shook. [Id. at 178]. Yang, however, testified that Petitioner had threatened Shook. [Id. at 135-36].

On cross-examination of Lee Swafford, a special agent with Homeland Security investigations, Davis sought to establish that Petitioner was not a suspect until after the CI, who was trying to mitigate his own criminal liability, identified Petitioner. [CR Doc. 293 at 3, 22-23, 48, 57, 59-60]. Swafford admitted that up to the point when the green Buick was stopped, all of

6

Swafford's information regarding Flores had come from the CI. [Id. at 39]. Then Swafford admitted that, after that point, he relied on testimony of people who had been arrested and charged in relation to the instant conspiracy to explain Petitioner's involvement. [Id. at 30].

Davis also elicited that none of the surveillance showed Petitioner carrying the cat litter box, that Petitioner did not own the green Buick and was not driving it when the officers stopped it, and that the methamphetamine was completely concealed in the cat litter box. [Id. at 34-37]. Davis also elicited that, although there were three other individuals found at the apartment, none were interviewed or asked about the handling of the cat litter box. [Id. at 38-39].

Following the close of the prosecution's evidence, Flores unsuccessfully moved for judgment of acquittal. [CR Doc. 316 at 3-8]. Petitioner rested without presenting any evidence and renewed his motion for judgment of acquittal. [Id. at 9-10]. The Court again denied the motion. [Id. at 10]. The jury convicted Petitioner on both counts and found both involved 500 grams or more of a mixture and substance containing methamphetamine and 50 grams or more of actual methamphetamine. [CR Doc. 258: Jury Verdict].

Prior to sentencing, a probation officer prepared a Presentence Investigation Report (PSR). [CR Doc. 273: PSR]. The probation officer recommended a base offense level of 38 because Petitioner's offense involved 4.5 kilograms or more of "ice," U.S.S.G. §2D1.1(c)(1). [Id. at ¶ 21]. The probation officer also recommended a two-level dangerous weapon enhancement, U.S.S.G. §2D1.1(b)(1); a two-level credible threat of violence enhancement, U.S.S.G. §2D1.1(b)(2); a two-level enhancement for maintaining a premises for manufacturing or distributing a controlled substance, U.S.S.G. §2D1.1(b)(12); and a three-level enhancement for being a manager or supervisor of the criminal activity, U.S.S.G. §3B1.1(b). [Id. at ¶¶ 22-24, 26]. The adjusted offense level was 47, but the total offense level was capped at 43 under the guidelines. [Id. at ¶¶ 28, 31].

7

With a criminal history category of I, the guidelines advised a term of life imprisonment. [Id. at ¶¶ 45, 69].

Petitioner objected to the PSR. [CR Docs. 286, 289]. He argued that the Court should not credit evidence that was not presented or proven at trial, that there was no evidence to support the drug quantity, that the leadership enhancement did not apply because Petitioner and his co-conspirators "equally joined and participated" in the offense, and that the PSR included no evidence that Petitioner exercised a leadership role. [Id.]. Petitioner argued that his offense level should be 32. He claimed the PSR did not explain the method used to determine the quantity of drugs attributable to him and the total amount of drugs involved in the conspiracy was not reasonably foreseeable to him. He further argued that he was not charged with a firearm offense and there was no credible evidence that a firearm was present during any drug-related activity. He also claimed he did not threaten to use or use violence against anyone, and he was in custody at the time he asked Yang where Shook was living. Petitioner argued the premises enhancement should not apply because any drug activity that occurred at the apartment was collateral to its primary use as a residence and controlled substances were not routinely stored there. Finally, he claims that there was no evidence that he was a manager or supervisor, where he and another co-defendant occasionally worked together, and the co-defendant sometimes drove to some of the drug transactions. [CR Doc. 289]. The Government's sentencing memorandum included investigation reports corroborating the weapon, supervisory role, and threat enhancements, as well as the drug quantity. [CR Docs. 287, 287-1, 290, 290-1].

Petitioner moved for a substantial downward variance to 120 months' imprisonment based on the 18 U.S.C. § 3553 sentencing factors. [Doc. 288]. Petitioner noted that, "[a]fter several months of intense negotiations a plea agreement could not be reached." [Id. at 3]. Petitioner was

8

sentenced on September 5, 2017. [CR Doc. 307: Sentencing Tr.]. At the sentencing hearing – after the failed plea negotiations and after the trial – Petitioner testified that he was "satisfied with the services of [his] attorney." [Id. at 2]. Counsel stated that Petitioner "chose to go to trial because he could not come to a plea agreement with the Government." [Id. at 3]. Petitioner's counsel argued extensively against application of the recommended enhancements and the drug quantities. [Id. at 3-24]. With respect to the firearm enhancement, which increased Petitioner's TOL by two levels, Petitioner's counsel noted it "was a real sticking point in any kind of negotiated plea that we were trying to accomplish." Further, "[n]o one ever testified and we have no evidence, no evidence whatsoever, of any actual or constructive possession of a firearm by [Petitioner]. That just didn't happen." [Id. at 10]. Counsel argued that "even on the preponderance of the evidence, they can't really say that [Petitioner] was a manager, they can't say that he carried guns, they can't say he recruited people." [Id. at 22]. In response, the Government pointed to specific information from the PSR, the trial, and evidence submitted with the Government's sentencing memoranda that supported each enhancement and the drug quantity. [See id. at 25-35]. The Government noted that it had done a reverse proffer with Petitioner and "explained to him that he was looking at a very possible life sentence in this case if he went to trial." [Id. at 61]. The Court adopted the PSR as written, explaining why each enhancement and the drug quantity applied. [Id. at 35-36]. After hearing extensive arguments on the § 3553 sentencing factors [id. at 36-64], the Court acknowledged that "[Petitioner] may have gone to trial on account of his concerns about possible enhancements, but the enhancements were supported by the evidence." [Id. at 65]. The Court sentenced Petitioner to a term of life of each count, to be served concurrently. [Id. at 69]. Judgment on Petitioner's conviction was entered on September 6, 2017. [CR Doc. 296: Judgment].

### C. Petitioner's Appeal

Petitioner appealed the Court's sentence, arguing that it was procedurally and substantively unreasonable. United States v. Flores, 733 Fed. App'x 89, 90 (4th Cir. 2018), cert. denied, 140 S. Ct. 94 (Oct. 7, 2019). The Fourth Circuit affirmed Petitioner's sentence, holding that "Flores' coconspirators' statements, both in and out of court, provided more than sufficient evidence to support all the enhancements, as well as the drug amount." Id. at 91. The Fourth Circuit also rejected Petitioner's challenge to the reasonableness of his sentence, citing his involvement "in an unusually large-scale methamphetamine conspiracy, involving unusually high[-]grade methamphetamine that originated with a Mexican drug cartel," and the fact that he "supervised an assistant, made threats, and carried firearms." Id. at 92.

### D. Petitioner's Motion to Vacate

On September 21, 2020, Petitioner filed a Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence. [CV Doc. 1]. Petitioner argues that he received ineffective assistance of counsel at trial and on appeal, that his sentence is substantively unreasonable, and that he is entitled to a reduction in his sentence under The First Step Act. [Id.; CV Doc. 1-1]. The Court ordered the Government to respond to Petitioner's § 2255 motion. [CV Doc. 2]. The Government sought and was granted an extension of time to file its response. [CV Doc. 3; 11/20/2020 Docket Entry]. Before the Government responded, Petitioner filed his "Motion for Time Bar and Equitable Tolling by the Government," in which he asks the Court to disregard the Government's response to his § 2255 motion as untimely.[2] [CV Doc. 4]. The Government then responded to the Petitioner's motion within the time allowed by the extension. [CV Doc. 8]. Less than a week

---

[2] The Court will deny this motion. The Government timely filed its response to Petitioner's motion to vacate. [See Doc. 5; 11/20/2020 Docket Entry].

later, the Government moved for leave to file an exhibit to its response. [CV Doc. 9]. Petitioner objects to the filing of this exhibit. [CV Doc. 10].

This matter is now ripe for adjudication.

## II.     STANDARD OF REVIEW

A federal prisoner claiming that his "sentence was imposed in violation of the Constitution or the laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a).

Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that courts are to promptly examine motions to vacate, along with "any attached exhibits and the record of prior proceedings . . ." to determine whether the petitioner is entitled to any relief on the claims set forth therein. After examining the record in this matter, the Court finds that the arguments presented by Petitioner can be resolved without an evidentiary hearing based on the record and governing case law. See Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

## III.    DISCUSSION

### A.     Ineffective Assistance of Counsel

The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions, the accused has the right to the assistance of counsel for his defense. See U.S. CONST. amend. VI. To show ineffective assistance of counsel, Petitioner must first establish a deficient performance by counsel and, second, that the deficient performance prejudiced him. See Strickland v. Washington, 466 U.S. 668, 687-88 (1984). In making this determination, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional

assistance." Id. at 689; see also United States v. Luck, 611 F.3d 183, 186 (4th Cir. 2010). Furthermore, in considering the prejudice prong of the analysis, the Court "can only grant relief under . . . Strickland if the 'result of the proceeding was fundamentally unfair or unreliable.'" Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998) (quoting Lockhart v. Fretwell, 506 U.S. 364, 369 (1993)). Under these circumstances, the petitioner "bears the burden of affirmatively proving prejudice." Bowie v. Branker, 512 F.3d 112, 120 (4th Cir. 2008). To establish prejudice, the petitioner must demonstrate there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. It is not sufficient to show the mere "'possibility of prejudice.'" Satcher v. Pruett, 126 F.3d 561, 572 (4th Cir. 1994) (quoting Murray v. Carrier, 477 U.S. 478, 494 (1986)). If the petitioner fails to meet this burden, a "reviewing court need not even consider the performance prong." United States v. Rhynes, 196 F.3d 207, 232 (4th Cir. 1999), opinion vacated on other grounds, 218 F.3d 310 (4th Cir. 2000).

### A. Pre-Plea Representation

Defendants are entitled to effective assistance of competent counsel during plea negotiations. McMann v. Richardson, 397 U.S. 759, 771, 90 S. Ct. 1441 (1970). Effective assistance of counsel at the plea-bargaining stage requires that defense counsel "communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." Missouri v. Frye, 566 U.S. 134, 145, 132 S. Ct. 1399, 1408 (2012). This duty certainly applies where a plea offer is formal and with a fixed expiration date. Id. Moreover, "it is the responsibility of defense counsel to inform a defendant of the advantages and disadvantages of a plea agreement and the attendant statutory and constitutional rights that a guilty plea would

12

forego." Libretti v. United States, 516 U.S. 29, 50-51, 116 S. Ct. 356, 368 (1995). Counsel, however, is not ineffective for failing to obtain a plea offer that a defendant is willing to accept. See Weatherford v. Bursey, 429 U.S. 545, 561 (1977) (recognizing "there is no constitutional right to plea bargain").

"To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance," a petitioner must "show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time." Frye, 566 U.S. at 147, 132 S. Ct. at 1409. Namely, a petitioner must "show the outcome of the plea process would have been different with competent advice." Lafler v. Cooper, 566 U.S. 156, 163 (2012). That is, he must show that "but for the ineffective advice of counsel there is a reasonable probability" that he would have pleaded guilty on terms that the prosecution and the court would have accepted, and the conviction or sentence under the plea "would have been less severe than under the judgment and sentence that in fact were imposed." Id. at 164. Courts, however, "should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies." Lee v. United States, 137 S. Ct. 1958, 1967 (2017). Rather, the court should look to contemporaneous evidence of his desire to pursue a particular course of action. Id.

Petitioner claims that Davis' deficient performance caused Petitioner to receive a life sentence because Davis "failed to inform [Petitioner] of [the] difference between having a trial or pleading guilty, and also the futility of going to trial to only fight the enhancements." [CV Doc. 1 at 5, 7]. Petitioner contends that "[h]ad defense counsel explained to [Petitioner] that it was in his best interests to plead guilty and argue against the enhancements at sentencing, more than likely [Petitioner] would have pled guilty and accepted responsibility similar to his co-defendants." [CV

13

Doc. 1-1 at 8]. Petitioner states that a "better strategy … would [have been] to plead guilty and hold an evidentiary hearing to argue the enhancements." [Id.]. Petitioner now claims -- for the first time in his reply -- that Davis advised him not to take the plea deal. [CV Doc. 8 at 15-16 ("Mr. Flores was willing to plea at any time, but he chosen [*sic*] not to because counsel advised him not to take the plea deal.")].

Petitioner's claim fails. Petitioner was advised of the option of pleading guilty and preserving his right to challenge the sentencing enhancements as part of the final plea deal that was offered to and rejected by him. Namely, Petitioner could have pled guilty to Count One, with a statutory maximum sentence of 20 years, and maintained his right to argue enhancements at sentencing. Petitioner, instead, sought to have his first attorney removed because Petitioner felt his attorney was trying to force him to plead guilty. [CR Doc. 185]. And he rejected the exact type of offer he now states he would have accepted. Davis' emails with the Government show that he presented the plea offer to Petitioner. Davis stated, "I have reviewed the new plea agreement with Mr. Flores" and asked for additional time "to specifically explain the differences in the previous plea offers to [Petitioner]." [CV Doc. 5-1]. Six days later, Davis asked the Government to make certain changes to the factual basis. [CV Doc. 5-2]. The Government obliged. [See id.]. Despite having the chance to plead guilty and challenge the enhancements, Petitioner choose to go to trial knowing that he could receive a life sentence. As such, the record does not support Petitioner's *post hoc* assertions that he would have pleaded guilty had he known he could still challenge the enhancements.

Moreover, Petitioner does not contend that Davis made any representations to him regarding the merits of a trial nor that Davis suggested Petitioner would be acquitted. Rather, Petitioner asserts that Davis suggested that if Petitioner felt strongly about challenging the

sentencing enhancements, "this issue could be possibly resolved favorably by going to trial." [CV Doc. 1-1 at 13]. Even if this contention were true, advice that proceeding to trial could conceivably limit the conduct for which a defendant is responsible as part of a drug conspiracy falls within the wide range of reasonable professional assistance. See Strickland, 466 U.S. at 689. Through trial, Petitioner had the opportunity to challenge the Government's evidence and to attempt to disassociate himself from any incriminating evidence, which he did. Had Petitioner been found not guilty at trial, as he claimed he was, enhancements would have obviously been irrelevant. Furthermore, Petitioner does not claim he would have been better positioned to fight the enhancements had he not proceeded to trial.

As such, Petitioner has failed to show deficient performance by counsel relative to pre-plea representation and his claim on this ground will be dismissed. See Strickland, 466 U.S. at 687-88.

### B. Appellate Counsel

Courts should ordinarily find ineffective assistance of counsel for failure to raise claims on appeal only when "ignored issues are clearly stronger than those presented." Smith v. Robbins, 528 U.S. 259, 288 (2000) (internal citation and quotation omitted). Appellate counsel is not required to assert all non-frivolous issues on appeal. Griffin v. Aiken, 775 F.2d 1226, 1235 (4th Cir. 1985). Rather, "it is the hallmark of effective appellate advocacy" to winnow out weaker arguments and to focus on more promising issues. Smith v. Murray, 477 U.S. 527, 536 (1986). Thus, "[a] decision with respect to an appeal is entitled to the same presumption that protects sound trial strategy." Pruett v. Thompson, 996 F.2d 1560, 1568 (4th Cir. 1993). Additionally, the petitioner still bears the burden of showing that there is a reasonable probability that but for counsel's failure to raise an issue on appeal, the result of the proceeding would have been different, i.e., that he would have prevailed on appeal. See Robbins, 528 U.S. at 285-86.

The Confrontation Clause "applies to 'witnesses' against the accused," those who provide testimony against him. Crawford v. Washington, 541 U.S. 36, 51 (2004). It protects against the admission of testimonial hearsay at trial where the witness is not present, unless the witness is unavailable, and the defendant had a prior opportunity to cross-examine the witness. Id. at 59. The Confrontation Clause does not apply to non-hearsay evidence. See United States v. Brown, 576 Fed. App'x 145, 148-49 (4th Cir. 2014).

Petitioner claims that he received ineffective assistance of appellate counsel because his appellate counsel did not argue that the trial court's admission of what the CI said during the recorded conversation violated the Confrontation Clause. [CV Docs. 1 at 4, 1-1 at 1-6]. Petitioner claims that the CI's statements were testimonial because the CI was acting as a government agent who was trying to elicit "conversation to serve as evidence" of the drug transaction. [CV Doc. 1-1 at 3-4]. And because the CI did not testify at trial, Petitioner argues that the statements were inadmissible and that his appellate counsel was ineffective for not raising a Confrontation Clause issue on direct appeal.[3] [See id. at 6]. This claim fails.

"[T]ape recorded statements between a defendant and a confidential informant are admissible because (1) the defendant's own statements are neither hearsay nor made in anticipation of a criminal prosecution, and (2) the informant's statements are not hearsay (and thus not covered by Crawford) because they are offered at trial only to provide context for the defendant's statements and not for the truth of the matter asserted." United States v. Barraza, 365 Fed. App'x 526, 530 (4th Cir. 2010). Here, as in Barraza, the CI's statements on the recording were not testimonial hearsay but rather admissible because they provided background and context for

---

[3] To be sure, Petitioner does not challenge the admissibility of his own statements on the recording. These statements were admissible as party admissions and statements against interest in any event. Fed. R. Evid. 801(d)(2)(A), 804(b)(3).

Petitioner's statements during the drug transaction. There was, therefore, no error in admitting the recording at trial, including the CI's statements. And appellate counsel's decision not to raise a meritless issue on appeal certainly did not constitute deficient performance. What is more, Petitioner has not and cannot show prejudice as this issue was not clearly stronger than the issues appellate counsel raised. The Court will, therefore, deny and dismiss this claim.

In sum, Petitioner has failed to show deficient performance or prejudice and his claims for ineffective assistance of counsel will be dismissed. See Strickland v. Washington, 466 U.S. 668, 687-88.

### C. Petitioner's Sentence

Petitioner asserts that his sentence was substantively unreasonable because (1) the District Court erred in its calculation of his base offense level and rejected his non-frivolous arguments against enhancements and (2) it creates an unwarranted sentencing disparity and fails to provide sufficient but not greater than just punishment and adequate deterrence.[4] [CV Doc. 1-1 at 18]. This claim fails. Petitioner unsuccessfully raised these issues on direct appeal and may not "circumvent a proper ruling on … direct appeal by re-raising the same challenge in a § 2255 motion." United States v. Linder, 552 F.3d 391, 397 (4th Cir. 2009); see Boeckenhaupt v. United States, 537 F.2d 1182, 1183 (4th Cir. 1976) (claims considered on direct review may not be recast "under the guise of collateral attack"). Though there is an exception to the re-litigation doctrine for intervening changes in the law, Petitioner has not shown such a change here. See Mincey v. United States, 2010 WL 3607680, at *4 (W.D.N.C. 2010) (unpublished) (holding that a § 2255 petitioner could not raise the same Fourth Amendment claim previously rejected on direct appeal unless he could show a change in the law that would make his claim viable on collateral review).

---

[4] Petitioner's argument on this issue is in very large part a replication of his appellate brief. [See CV Doc. 1-1 at 18-29].

Moreover, Petitioner's claims for relief related to sentencing are not cognizable on collateral review in any event.  See United States v. Foote, 784 F.3d 931 (4th Cir. 2015) (holding that a district court lacks authority to review a sentencing error that is neither constitutional nor jurisdictional "unless it amounts to a fundamental defect which inherently results in a complete miscarriage of justice").  The Court will, therefore, deny and dismiss these claims.

### D. First Step Act Claim

Petitioner contends that he is entitled to a reduction in his sentence under 18 U.S.C. § 3582(c)(1)(A)(i) of the First Step Act.  [CV Doc. 1 at 8; CV Doc. 1-1 at 15].  Petitioner argues that he can request relief directly with the sentencing court without first seeking relief with the Bureau of Prisons because of "extraordinary and compelling reasons warrant[ing] such a reduction."  [CV Doc. 1-1 at 15 (citing United States v. Holloway, 68 F.Supp.3d 310 (E.D.N.Y. 2014)).  Plaintiff misunderstands the law of this issue.

Section 3582(c)(1)(A), as amended by The First Step Act, Pub. L. No. 115-391, 132 Stat. 5194, 5239 (Dec. 21, 2018), permits a defendant to seek a modification of his sentence for "extraordinary and compelling reasons," if the defendant has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  18 U.S.C. § 3582(c)(1)(A).  By its plain language, § 3582(c)(1)(A) makes clear that a defendant must first exhaust all administrative remedies or wait thirty days after submitting a request for release from the warden without receiving any response before filing a motion for a sentence reduction.  The Court of Appeals for the Fourth Circuit has held that a district court lacks authority to modify a sentence except in the narrow circumstances and procedures et forth in § 3582.  See United States v. Goodwyn, 596 F.3d 233, 235 (4th Cir. 2010).

Here, Petitioner acknowledges not having exhausted his administrative remedies. The Court, therefore, lacks authority to modify Petitioner's sentence. Id. The Court will, therefore, deny Petitioner's motion for relief under The First Step Act without prejudice to refiling once Petitioner has exhausted his administrative remedies in accordance with § 3582(c)(1)(A). Petitioner is advised that any such motion for relief should be brought in his criminal proceeding only, not in this matter. In so holding, the Court does not consider the merits of any such motion.

## IV. CONCLUSION

For the foregoing reasons, the Court denies and dismisses Petitioner's Section 2255 Motion to Vacate with prejudice, except for Petitioner's motion for relief under The First Step Act, which the Court dismisses without prejudice to Petitioner refiling in his criminal proceeding once he has exhausted his administrative remedies.

**IT IS, THEREFORE, ORDERED** that:

1. Petitioner's motion for relief under The First Step Act [Doc. 1] is **DENIED WITHOUT PREJUDICE** in accordance with this Order and the remaining claims in Plaintiff's Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255 [Doc. 1] are **DENIED** and **DISMISSED WITH PREJUDICE**.

2. Petitioner's Motion for Time Bar and Equitable Tolling [Doc. 4] is **DENIED**.

3. The Government's Motion for Leave to File an Exhibit [Doc. 9] is **GRANTED**.

4. **IT IS FURTHER ORDERED** that pursuant to Rule 11(a) of the Rules Governing Section 2254 and Section 2255 Cases, this Court declines to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 338 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 473, 484 (2000) (when relief is

denied on procedural grounds, a petitioner must establish both that the dispositive procedural ruling is debatable and that the petition states a debatable claim of the denial of a constitutional right).

**IT IS SO ORDERED**.

Signed: April 23, 2021

Kenneth D. Bell
United States District Judge