# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### STATESVILLE DIVISION
### 5:20-cv-00152-KDB
### (5:15-cr-00073-KDB-DCK-3)

| | | |
|---|---|---|
| **CARLOS ANTONIO FLORES,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **ORDER** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on remand from the United States Court of Appeals for the Fourth Circuit, [CV Docs. 16, 16-1],[1] after the Government's motion to remand for an evidentiary hearing in Petitioner's Pro Se Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255, [CV Doc. 1], and the Fourth Circuit's order vacating this Court's Order in relevant part, [CV Doc. 16-1].

The sole issue before the Court on remand is whether Petitioner's attorney, Roderick Davis, provided ineffective assistance during the plea negotiations prior to trial. After an evidentiary hearing on this issue and as found in the Court's vacated Order, the Court concludes that he did not. The Court, therefore, will again deny Petitioner's motion to vacate on this ground.

## I.      BACKGROUND

### A.      Offense Conduct

---

[1] Citations to the record herein contain the relevant document number referenced preceded by either the letters "CV," denoting that the document is listed on the docket in the civil case file number 5:20-cv-00152-KDB, or the letters "CR," denoting that the document is listed on the docket in the criminal case file number 5:15-cr-00073-KDB-DCK-3.

Petitioner Carlos Antonio Flores ("Petitioner") participated in an organization that distributed large quantities of high-purity methamphetamine in western North Carolina. [See CR Doc. 291 at ¶ 5: Presentence Investigation Report (PSR)]. Jose Duanes-Intriago ("Duanes") recruited Petitioner into his drug-trafficking organization in October 2014. [CR Doc. 294 at 154-55: Trial Tr.]. Petitioner obtained methamphetamine from Duanes and delivered it to Duanes' customers in several counties in Western North Carolina. Petitioner collected money for the drugs. [CR Doc. 294 at 156-58, 198-99, 219]. During the year that Petitioner worked with Duanes, Petitioner participated in trafficking 15 to 20 kilograms of methamphetamine for approximately $400,000.00. [CR Doc. 294 at 158].

Petitioner regularly received and distributed drugs in an apartment that he shared with Juan Ernesto Ortiz-Rodriguez ("Ortiz") in Statesville, North Carolina. [CR Doc. 294 at 159-61, 166-69, 200-01]. Duanes also picked up money from Petitioner at that location. [CR Doc. 294 at 201-02, 211-12]. Duanes kept methamphetamine in two cat litter boxes at the apartment. [CR Doc. 294 at 159-61, 166-69, 200-02]. Each box contained 30 ounces of methamphetamine. [CR Doc. 294 at 166-69]. Ritchie Shook, another methamphetamine dealer, was a regular customer of Petitioner and Duanes, who often fronted methamphetamine to Shook. [CR Doc. 294 at 82-89, 159]. In the summer and fall of 2015, the two men sold Shook at least 130 ounces of methamphetamine. [CR Doc. 294 at 89-90, 100-01].

On October 30, 2015, Duanes directed one of his couriers to pick up one of the cat litter boxes from Petitioner at his apartment and deliver it to Shook. [CR Doc. 293 at 17-18: Trial Tr.; CR Doc. 294 at 161-62, 165-66]. Unbeknownst to Duanes, the courier was working with law enforcement as a confidential informant ("CI"). [CR Doc. 293 at 14]. Police equipped the CI with an audio recorder and gave him $8,000.00 to buy an additional 10 ounces of methamphetamine

2

from Petitioner. [CR Doc. 293 at 19, 47, 50-53; CR Doc. 294 at 54-55]. The CI went to the apartment and picked up one of the cat litter boxes containing methamphetamine. [CR Doc. 293 at 17-18, 55-56]. The CI also arranged to buy additional methamphetamine from Petitioner. [CR Doc. 294 at 54-55].

Shortly after Petitioner's transaction with the CI, police watched Petitioner and Ortiz leave their apartment in a green Buick. [CR Doc. 293 at 17-18; CR Doc. 294 at 12-13, 33]. Officers stopped the car and recovered, among other things, the cash that they had previously provided to the CI. [CR Doc. 294 at 13, 16, 35, 37-38, 53-54]. The officers arrested Ortiz and Petitioner, who had $2,000.00 and a small amount of methamphetamine in his pocket. [CR Doc. 293 at 19-20; CR Doc. 294 at 16]. The CI delivered the cat litter box containing methamphetamine to Shook, who gave it to Davey Yang, a co-conspirator, to resell. [CR Doc. 294 at 92-94]. Police arrested Yang and recovered the cat litter box containing methamphetamine from his car. [CR Doc. 293 at 73-74, 97].

### B. Criminal Proceedings[2]

In November 2015, Petitioner was indicted by a grand jury. [CR Doc. 50: Bill of Indictment]. Attorney Scott Gsell was appointed to represent Petitioner. [11/2/2015 Docket Entry]. On April 12, 2016, Gsell filed a motion for inquiry of counsel stating that Petitioner had advised him that he was not satisfied with Gsell's services and wanted a new attorney. [CR Doc. 131]. Following a hearing, the Magistrate Judge denied the motion, finding no basis for removal of Gsell. [CR Doc. 134]. In April 2016, a grand jury issued a First Superseding Bill of Indictment. [CR Doc. 136].

---

[2] This summary is derived from the record in the criminal proceeding and from evidence presented at the September 22, 2022 evidentiary hearing, where appropriate. The parties' hearing exhibits are identified as "Gov't Ex. __" and "Pet'rs Ex. __," respectively.

On July 19, 2016, Petitioner was charged in a Second Superseding Bill of Indictment with one count of methamphetamine trafficking conspiracy in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count One) and one count of possession with intent to distribute methamphetamine and aiding and abetting the same in violation of 21 U.S.C. §§ 841(a)(1) and 18 U.S.C. § 2 (Count Two). [CR Doc. 183: Second Superseding Indictment]. On both counts, the Second Superseding Indictment charged that 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine and 50 grams or more of actual methamphetamine were reasonably foreseeable by Petitioner; thus, 21 U.S.C. § 841(b)(1)(A) applied. [Id. at 1-2].

The day before the Second Superseding Indictment was filed, Petitioner filed a pro se motion for inquiry of counsel. [CR Doc. 185]. Petitioner asserted that Gsell had provided ineffective assistance "by applying force to the petitioner to sign an [ill-]advised plea," including signing away his rights under the Freedom of Information Act and providing assistance to the United States after "I made clear I wouldn't assist at all, most importantly, because I know nothing of or about these charges." [Id. at 2]. Petitioner also claimed that he felt that he was "being threatened or being forced to plea out because of a 2[-]level weapon enhancement" and two-level role enhancement, even though he never had a gun. [Id. at 3]. Following a hearing on July 27, 2016, the Magistrate Judge allowed Gsell to withdraw and appointed attorney Roderick Glenn Davis to represent Petitioner. [7/27/2016 & 8/2/2016 Docket Entries].

Two days after Davis was appointed, he filed a motion to continue the trial, stating he had not had adequate time to "meet Mr. Flores; review facts; review the discovery materials; discuss possible defenses; and inform Mr. Flores of the possible maximum punishments under the United States Sentencing Guidelines." [CR Doc. 192]. The Court granted the motion and entered two subsequent orders continuing the case on its own motion. [CR Docs. 193, 210, 233].

4

Davis and Petitioner met more than ten times over the course of Davis' representation. [CV Doc. 29 at 6, 53; see Pet'rs Ex. 5]. Davis engaged in extensive plea negotiations with the United States. [See CV Docs. 5-1, 5-2]. On September 16, 2016, the Government presented its first plea offer to Davis ("First Plea Offer"). The First Plea Offer allowed Petitioner to plead guilty to Count One, with "[a] sentence of **not less than ten (10) years nor more than life imprisonment**," in exchange for dismissal of Count Two. [Gov't Ex. 9 (emphasis in original)]. Pursuant to the First Plea Offer, the parties agreed to jointly recommend that the amount of actual methamphetamine known or reasonably foreseeable to Petitioner was at least 500 grams but less than 4,500 grams and that the parties could advocate the specific amount within that range, as well as whether the base offense level was 34 or 36. In the First Plea Offer, the parties reserved their right to argue whether Petitioner should receive a two-level weapon enhancement and a two-level role enhancement, as well as their right to "argue their respective positions regarding other" enhancements, adjustments, departures, or variances from the applicable guideline range. The First Plea Offer stated that Petitioner's guilty plea was not timely for purposes of receiving an additional one-point reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(b). The First Plea Offer included waivers of Petitioner's appellate and post-conviction rights. [Gov't Ex. 9]. It did not include the standard language regarding substantial assistance. [See id.].

On September 19, 2016, the Government conducted a reverse proffer with Petitioner. During the reverse proffer, the Government told Petitioner that he should not just plead guilty, but also cooperate, and that he was looking at a life sentence if he did not cooperate. [CV Doc. 29 at 25]. Davis presented the First Plea Offer to Petitioner and discussed it with him both before and after the reverse proffer. [Id. at 57].

5

Following the reverse proffer, Davis asked the Government to remove both the two-point enhancements from the First Plea Offer and to agree not to make any recommendations regarding those enhancements at sentencing. Davis also asked for Petitioner to receive the additional one-point reduction for acceptance of responsibility. Although the Government originally responded that it could not offer that reduction, the Government later agreed to it. The Government also stated that it could remove the reference to enhancements in the First Plea Offer, but that the factual basis would have to include the supporting facts, noting Petitioner's objections to them. The Government offered to add a stipulation that it would not oppose a sentence at the bottom of the applicable guideline range. [Gov't Ex. 10; CV Doc. 29 at 58-59]. Davis presented these changes to Petitioner, but he still rejected this plea offer ("Second Plea Offer"). [CR Doc. 29 at 59].

On December 7, 2016, the Government sent Petitioner an email labeled, "Carlos Flores final-best offer." The email advised Davis that the Government was "giving 'till it hurts," that he would need the signed documents within the next few days, and that an additional witness might be added to the witness list. This Third Plea Offer included a recommendation by the parties that the amount of actual methamphetamine known or reasonably foreseeable to Petitioner was at least 50 grams and that the parties reserved their right to advocate the specific amount and whether Petitioner should receive a base offense level of 30 or more. The Third Plea Offer also provided that Petitioner's plea was timely for purposes of acceptance of responsibility; that either party could argue its respective positions regarding reductions, enhancements, departures, or variances; and that the Government would not oppose a sentence at the bottom end of the guidelines range. [Gov't Ex. 11; CV Doc. 29 at 60-62].

On December 12, 2016, the Government emailed Davis to ask what Petitioner's decision was on the Third Plea Offer. The next day, Davis responded, "Mr. Flores has not changed his

position.  I'll keep trying as we prepare for trial but it is his choice and I cannot make that decision for him."  The Government responded, "Don't bother trying any further.  We are way past any plea deadline, and there will be no further offers."  [Govt Ex. 12; CV Doc. 29 at 63-64].  Davis nonetheless continued to negotiate on Petitioner's behalf.  [CV Doc. 29 at 33, 64].

On January 11, 2017, the Government emailed a new plea offer (the "Fourth Plea Offer") to Davis. The Fourth Plea Offer consisted of a plea to a proposed Bill of Information that charged Petitioner with one count of conspiracy to traffic "a mixture and substance containing a detectable amount of methamphetamine."  This effectively removed the mandatory minimum sentence and reduced the statutory maximum sentence to 20 years' imprisonment.  Under the Fourth Plea Offer, the parties agreed to jointly recommended that the amount of actual methamphetamine known or reasonably foreseeable to Petitioner was at least 50 grams and that parties reserved their right to advocate as to the specific amount and whether he should receive a base offense level of 30 or more.  The Fourth Plea Offer again included the agreement that the guilty plea was timely for purposes of acceptance of responsibility and that either party could argue its respective position regarding reductions, enhancements, departures, or variances; and that the Government would not oppose a sentence at the bottom end of the guidelines range.  On January 18, 2017, the Government advised that Petitioner would have to sign both the Fourth Plea Offer and the factual basis "this week" to take "this amazing offer."  [Gov't Ex. 13; CV Doc. 29 at 64-65].  Davis presented this offer to Petitioner.  [CV Doc. 29 at 64, 68].

On January 20, 2017, Davis advised the Government, "I have reviewed the new plea agreement with Mr. Flores.  Please give me some additional time to specifically explain the difference in the previous plea offers."  [CV Doc. 5-1].  On January 26, 2017, Davis emailed the Government, stating "This seems more like a used car negotiation as opposed to a plea

negotiation," and "I have never attempted to negotiate a plea offer this many times." Davis stated that Petitioner would sign the Fourth Plea Offer "right now" if certain delineated changes were made to the factual basis. [Gov't Ex. 14; CV Doc. 29 at 66-68]. The Government agreed to the proposed changes and sent Davis a new proposed factual basis reflecting the changes. [Gov't Ex. 14]. Petitioner, nonetheless, rejected the Fourth Plea Offer and proceeded to trial. The jury convicted Petitioner on both counts and found both involved 500 grams or more of a mixture and substance containing methamphetamine and 50 grams or more of actual methamphetamine. [CR Doc. 258: Jury Verdict].

Prior to sentencing, a probation officer prepared a Presentence Investigation Report (PSR). [CR Doc. 273: PSR]. The probation officer recommended a base offense level of 38 because Petitioner's offense involved 4.5 kilograms or more of "ice," U.S.S.G. §2D1.1(c)(1). [Id. at ¶ 21]. The probation officer also recommended a two-level dangerous weapon enhancement, U.S.S.G. §2D1.1(b)(1); a two-level credible threat of violence enhancement, U.S.S.G. §2D1.1(b)(2); a two-level enhancement for maintaining a premises for manufacturing or distributing a controlled substance, U.S.S.G. §2D1.1(b)(12); and a three-level enhancement for being a manager or supervisor of the criminal activity, U.S.S.G. §3B1.1(b). [Id. at ¶¶ 22-24, 26]. The adjusted offense level was 47, but the total offense level was capped at 43 under the guidelines. [Id. at ¶¶ 28, 31]. With a criminal history category of I, the guidelines advised a term of life imprisonment. [Id. at ¶¶ 45, 69].

Petitioner objected to the PSR. [CR Docs. 286, 289]. He argued that the Court should not credit evidence that was not presented or proven at trial, that there was no evidence to support the firearm enhancement or drug quantity, that the leadership enhancement did not apply because Petitioner and his co-conspirators "equally joined and participated" in the offense, and that the

8

PSR included no evidence that Petitioner exercised a leadership role. [Id.]. Petitioner argued that his offense level should be 32. He claimed the PSR did not explain the method used to determine the quantity of drugs attributable to him and the total amount of drugs involved in the conspiracy was not reasonably foreseeable to him. He further argued that he was not charged with a firearm offense and there was no credible evidence that a firearm was present during any drug-related activity. He also claimed he did not threaten to use or use violence against anyone, and he was in custody at the time he asked Yang where Shook was living. Petitioner argued the premises enhancement should not apply because any drug activity that occurred at the apartment was collateral to its primary use as a residence and controlled substances were not routinely stored there. Finally, he claimed that there was no evidence that he was a manager or supervisor, where he and another co-defendant occasionally worked together, and the co-defendant sometimes drove to some of the drug transactions. [CR Doc. 289]. The Government's sentencing memorandum included investigation reports corroborating the weapon, supervisory role, and threat enhancements, as well as the drug quantity. [CR Docs. 287, 287-1, 290, 290-1].

Petitioner moved for a substantial downward variance to 120 months' imprisonment based on the 18 U.S.C. § 3553 sentencing factors. [CR Doc. 288]. Petitioner noted that, "[a]fter several months of intense negotiations a plea agreement could not be reached." [Id. at 3]. Petitioner was sentenced on September 5, 2017. [CR Doc. 307: Sentencing Tr.]. At the sentencing hearing – after the failed plea negotiations and after the trial – Petitioner testified that he was "satisfied with the services of [his] attorney." [Id. at 2]. Counsel stated that Petitioner "chose to go to trial because he could not come to a plea agreement with the Government." [Id. at 3]. Petitioner's counsel argued extensively against application of the recommended enhancements and the drug quantities. [Id. at 3-24]. With respect to the firearm enhancement, which increased Petitioner's Total Offense

Level by two levels, Petitioner's counsel noted it "was a real sticking point in any kind of negotiated plea that we were trying to accomplish." Further, "[n]o one ever testified and we have no evidence, no evidence whatsoever, of any actual or constructive possession of a firearm by [Petitioner]. That just didn't happen." [Id. at 10]. Counsel argued that "even on the preponderance of the evidence, they can't really say that [Petitioner] was a manager, they can't say that he carried guns, they can't say he recruited people." [Id. at 22]. In response, the Government pointed to specific information from the PSR, the trial, and evidence submitted with the Government's sentencing memoranda that supported each enhancement and the drug quantity. [See id. at 25-35]. The Government noted that it had done a reverse proffer with Petitioner and "explained to him that he was looking at a very possible life sentence in this case if he went to trial." [Id. at 61]. The Court adopted the PSR as written, explaining why each enhancement and the drug quantity applied. [Id. at 35-36]. After hearing extensive arguments on the § 3553 sentencing factors [id. at 36-64], the Court acknowledged that "[Petitioner] may have gone to trial on account of his concerns about possible enhancements, but the enhancements were supported by the evidence." [Id. at 65]. The Court sentenced Petitioner to a term of life on each count, to be served concurrently. [Id. at 69]. Judgment on Petitioner's conviction was entered on September 6, 2017. [CR Doc. 296: Judgment].

Petitioner appealed the Court's sentence, arguing that it was procedurally and substantively unreasonable. United States v. Flores, 733 Fed. App'x 89, 90 (4th Cir. 2018), cert. denied, 140 S. Ct. 94 (Oct. 7, 2019). The Fourth Circuit affirmed. Id.

### D.     Petitioner's Motion to Vacate

On September 21, 2020, Petitioner filed a Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence. [CV Doc. 1]. Petitioner argued that he received ineffective assistance

of counsel at trial and on appeal, that his sentence is substantively unreasonable, and that he is entitled to a reduction in his sentence under The First Step Act. [Id.; CV Doc. 1-1]. As to the claim for ineffective assistance of trial counsel, Petitioner argued that: (1) "Davis' ineffective assistance caused [Petitioner] to receive a life sentence;" and (2) Davis "failed to inform [Petitioner] of [the] difference between having a trial or pleading guilty, and also the futility of going to trial to only fight the enhancements." [Id. at 5, 7]. The Government responded to Petitioner's motion on the Court's Order. [CV Docs. 2, 5]. In his reply, Petitioner claimed for the first time that Davis advised him not to take a plea deal.[3] [CV Doc. 8 at 15-16 ("Mr. Flores was willing to plea at any time, but he chosen [*sic*] not to because counsel advised him not to take the plea deal.")].

After full briefing but without an evidentiary hearing, the Court denied and dismissed these claims on the merits. [CV Doc. 11]. Petitioner appealed. [CV Doc. 13]. After the Fourth Circuit granted a certificate of appealability on the sole issue of Petitioner's claim that Davis was ineffective during plea negotiations, the Government moved to remand for an evidentiary hearing on this issue. [CV Doc. 16-1]. On September 29, 2022, this Court conducted the hearing, and the parties thereafter provided proposed findings of fact and conclusions of law on the Court's direction. [See CV Doc. 29 at 126: Hearing Tr.; CV Doc. 30[4]].

_____

[3] In his reply, Petitioner also stated, "One can only imagine why trial counsel didn't want Mr. Flores to plea out. Maybe he seen something in the plea offer that will put Mr. Flores and his family in danger, because today's drug cartels are not the drug cartels of 25 years ago. The drug cartels of today, everyone is fair game, and your family is at danger, as well." [CV Doc. 8 at 16].

[4] Petitioner's counsel provided Petitioner's proposed findings and conclusions to the Court by email.

### E.    Evidentiary Hearing

Petitioner and Davis both testified extensively at the evidentiary hearing.  [See CV Doc. 29].  Petitioner testified that Davis told him "through the whole plea negotiation" that if Petitioner went to trial and "everything went wrong," the most Petitioner could get was 20 years.  [Id. at 7, 15-17, 46 ("Mr. Davis kept on telling me there's no way I could get life.")].  Petitioner testified that every time Davis would come to discuss the plea agreement with him, Davis would tell Petitioner they should go to trial because "they didn't have no evidence on me" and "the most I could get was 20 [years]."  [Id. at 7-8].  Nonetheless, Petitioner acknowledged that he did not argue or allege in his motion to vacate that Davis promised him a 20-year sentence or that Davis promised him that he would not get a life sentence.  [Id. at 42].  Moreover, Petitioner testified that he "knew throughout the proceedings" that he was facing a statutory "minimum of 10 years and a maximum of life."  [Id. at 43].  Petitioner also testified that he did not know why Davis wanted him to plead guilty, but that Petitioner choose to follow Davis' advice anyways.  [Id. at 43, 84].

Petitioner testified that he never saw the First Plea Offer, which contained a drug amount of actual methamphetamine of between 500 grams and 4,500 grams.  [Id. at 28, 30-31; see Gov't Ex. 9].  Petitioner testified that all the plea offers Davis showed him said "at least 500 grams or more and 50 [grams] of actual ice."  [Id. at 28].  Petitioner testified that he "hadn't seen any plea agreements that had a larger quantity of methamphetamine" and that "[t]hey all said at least 500 grams or more" without a cap.  [Id.].  Petitioner testified "[t]hat's why we kept on going back and forth with the prosecutor because they didn't want to put an actual drug amount on my plea agreements."  [Id.].

Despite claiming to have never seen the First Plea Offer, Petitioner recalled the reverse proffer with the Government.  [Id. at 24].  He recalled the Government going through the facts of

the case and explaining the expected testimony of Petitioner's co-Defendants. [Id. at 24-25]. Petitioner testified that the Government told him that he faced a life sentence if he did not cooperate. [Id. at 25].

Petitioner testified that, while Davis explained all the potential enhancements, Petitioner did not agree that they applied and consistently denied the conduct on which they were based. [CV Doc. 29 at 13-14, 22; CV Doc. 1-1 at 13]. Petitioner testified that he did not know that he could fight the sentencing enhancements at sentencing and that he and Davis decided that the best way to fight them was to go to trial. [Id. at 12-14, 38]. Petitioner testified that he "kept asking" Davis how he could be subject to a firearm enhancement if he "was never caught with a gun." [Id. at 13; see id. at 22]. Petitioner also testified that Davis explained that the Government believed Petitioner was subject to a leadership-role enhancement because "supposedly someone said that [Petitioner] hired somebody to be [his] driver," so that put Petitioner in a leadership role. [Id. at 13]. Finally, Petitioner testified that Davis also explained the potential application of the enhancement for threatening a witness. [Id.].

Davis, on the other hand, testified that he never told Flores that they had to proceed to trial to challenge the enhancements. Rather, he advised Petitioner that he could preserve his right to object to the enhancements and challenge them at sentencing. [Id. at 83-84]. Moreover, Davis negotiated for Petitioner to maintain objections to the paragraphs of the factual basis bearing on the enhancements. [Id. at 76-78; see Gov't Ex. 14 at 6].

Despite claiming in his motion to vacate that he went to trial only to fight enhancements, Petitioner testified that he and Davis "always discussed the drug amount and that's why we never came to an agreement with the government about a plea agreement because they wanted to leave the drug amount open." [Id. at 21, 29; see CV Doc. 1 at 7]. Petitioner further explained, "That's

my whole issue during the whole plea agreement is because the prosecutor didn't want to put a cap on the drug amount." [Id. at 29].

Petitioner testified that he did not see the Fourth Plea Offer, which included a 20-year maximum sentence, until the evidentiary hearing in this proceeding. [Id. at 35, 48]. Petitioner, however, also testified that he had seen the corresponding modified factual basis and did not want to sign it because he disagreed with one of the factual recitations. [Id. at 35-36]. Petitioner testified that he recalled that Davis was able to negotiate that Petitioner could maintain his objection to that paragraph and nonetheless sign the factual basis. Petitioner further testified that he recalled discussing this modified factual basis with Davis and that Davis advised him that the Government would still argue the facts that were subject to Petitioner's objection and "find [Petitioner] guilty of that." [Id. at 37-38]. Ultimately, on the Court's questioning, Petitioner testified that he recalled seeing "at least four" plea agreements. [Id. at 49].

Davis testified that Petitioner wanted all paragraphs referencing cooperation with the Government removed from the plea agreement. [Id. at 62-63, 68]. Davis testified that "it's obvious why he wanted [that language] out. He wasn't going to cooperate and he didn't want anyone to get the impression that he had cooperated." [Id. at 63]. Petitioner testified that he was not interested in cooperating with the Government because "[t]hey was asking me questions I didn't know nothing about." [Id. at 23]. At the hearing, Petitioner denied that he was concerned about the safety of his family if he pleaded guilty, but he did acknowledge that "if you go to prison with that on your paperwork, you're likely to get hurt," [Id. at 44].

Petitioner testified about a letter dated February 2, 2017, that Petitioner claims he wrote to Davis after Davis visited him earlier that day. [CV Doc. 29 at 8-9]. In that letter, Petitioner wrote, "Why you didn't want me to take the plea?" [Id. at 9]. Petitioner testified that he wrote that

14

because Davis "kept telling [him] not to take it because it was … a dummy plea." [Id.]. Petitioner testified that, by that time, Davis had shown him at least four plea offers. [Id.]. Petitioner testified that all the plea offers he saw included a possible sentence of 10 years to life imprisonment. [Id. at 9-10, 32]. Petitioner testified that he wrote the letter after receiving advice from "people in jail." [Id. at 10]. Petitioner testified that he did some research to attack the sentencing enhancement, citing two cases in the letter, Alleyne v. United States, 133 S.Ct. 2151 (2013) and Apprendi v. New Jersey, 530 U.S. 466 (2000). [Id. at 42]. Petitioner wrote in the letter that, under these cases, "any fact that increases the mandatory minimum is an element that must be submitted to the jury and allege[d] in the indictment." [CV Doc. 8 at 38].

Davis, on the other hand, testified that he did not receive many letters from Petitioner and that he did not recall ever receiving the February 2, 2017 letter. [CV Doc. 29 at 97-98]. Davis testified that it was not in his file, but that he did have another letter sent by Petitioner in his file, including that letter's envelope. [Id. at 98]. Davis testified, "If he wrote it and I received it, then my mind must have been erased because a lot of the things that he has in here … like, case cites in here like Alleyne versus United States…. We weren't talking about stuff like this…. I don't even think I was throwing out citations and stuff like that." [Id. at 99]. Davis further testified, "I'm not saying he fabricated it, but I don't remember any letters or anything that we had with, like, case cites in it…. We weren't talking in those type of terms." [Id.]. Davis also testified that he never used the term "dummy plea," but that he is aware that "a lot of people that are in custody will routinely say something like to the effect that's just the first plea offer. Everybody rejects the first plea offer. They're going to have another offer. And he might have referred to it as a dummy plea offer, but I didn't refer to it as a dummy plea offer." [Id. at 60].

Finally, Davis testified that he presented all the plea offers to Petitioner. [Id. at 68]. Davis reviewed the entire First Plea Offer with Petitioner, which included Davis providing Petitioner with a copy of the Offer and reviewing all its terms in detail. [Id. at 68-70]. With subsequent plea offers, Davis focused on going through and explaining the parts of the plea offer that changed from the previous offer(s). [Id. at 69]. Davis testified that he explained the pros and cons of going to trial over taking a plea offer and that he advised Petitioner that "there were a lot more cons in this case going to trial than pros." [Id. at 106-9]. Despite Davis negotiating very favorable terms and preserving objections to portions of the factual basis, Petitioner rejected all plea offers.

## II.     STANDARD OF REVIEW

A federal prisoner claiming that his "sentence was imposed in violation of the Constitution or the laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that courts are to promptly examine motions to vacate, along with "any attached exhibits and the record of prior proceedings . . ." in order to determine whether the petitioner is entitled to any relief on the claims set forth therein. "[W]hen a movant presents a colorable Sixth Amendment claim showing disputed facts beyond the record, or when a credibility determination is necessary to resolve the claims," an evidentiary hearing is necessary. United States v. Mayhew, 995 F.3d 171, 176-77 (4th Cir. 2021) (citing United States v. Witherspoon, 231 F.3d 923, 926-27 (4th Cir. 2000)).

16

## III.     DISCUSSION

The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions, the accused has the right to the assistance of counsel for his defense.  See U.S. CONST. amend. VI.  To show ineffective assistance of counsel, Petitioner must first establish a deficient performance by counsel and, second, that the deficient performance prejudiced him.  See Strickland v. Washington, 466 U.S. 668, 687-88 (1984).  In making this determination, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Id. at 689; see also United States v. Luck, 611 F.3d 183, 186 (4th Cir. 2010). Furthermore, in considering the prejudice prong of the analysis, the Court "can only grant relief under . . . Strickland if the 'result of the proceeding was fundamentally unfair or unreliable.'" Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998) (quoting Lockhart v. Fretwell, 506 U.S. 364, 369 (1993)).  Under these circumstances, the petitioner "bears the burden of affirmatively proving prejudice."  Bowie v. Branker, 512 F.3d 112, 120 (4th Cir. 2008).  To establish prejudice, the petitioner must demonstrate there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id.  It is not sufficient to show the mere "'possibility of prejudice.'"  Satcher v. Pruett, 126 F.3d 561, 572 (4th Cir. 1994) (quoting Murray v. Carrier, 477 U.S. 478, 494 (1986)).  If the petitioner fails to meet this burden, a "reviewing court need not even consider the performance prong."  United States v. Rhynes, 196 F.3d 207, 232 (4th Cir. 1999), opinion vacated on other grounds, 218 F.3d 310 (4th Cir. 2000).

Defendants are entitled to effective assistance of competent counsel during plea negotiations.  McMann v. Richardson, 397 U.S. 759, 771, 90 S. Ct. 1441 (1970).  Effective

assistance of counsel at the plea-bargaining stage requires that defense counsel "communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." <u>Missouri v. Frye</u>, 566 U.S. 134, 145, 132 S. Ct. 1399, 1408 (2012). This duty certainly applies where a plea offer is formal and with a fixed expiration date. <u>Id.</u> Moreover, "it is the responsibility of defense counsel to inform a defendant of the advantages and disadvantages of a plea agreement and the attendant statutory and constitutional rights that a guilty plea would forego." <u>Libretti v. United States</u>, 516 U.S. 29, 50-51, 116 S. Ct. 356, 368 (1995). Counsel, however, is not ineffective for failing to obtain a plea offer that a defendant is willing to accept. <u>See</u> <u>Weatherford v. Bursey</u>, 429 U.S. 545, 561 (1977) (recognizing "there is no constitutional right to plea bargain").

"To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance," a petitioner must "show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time." <u>Frye</u>, 566 U.S. at 147, 132 S. Ct. at 1409. Namely, a petitioner must "show the outcome of the plea process would have been different with competent advice." <u>Lafler v. Cooper</u>, 566 U.S. 156, 163 (2012). That is, he must show that "but for the ineffective advice of counsel there is a reasonable probability" that he would have pleaded guilty on terms that the prosecution and the court would have accepted, and the conviction or sentence under the plea "would have been less severe than under the judgment and sentence that in fact were imposed." <u>Id.</u> at 164. Courts, however, "should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies." <u>Lee v. United States</u>, 137 S. Ct. 1958, 1967 (2017). Rather, the court should look to contemporaneous evidence of his desire to pursue a particular course of action. <u>Id.</u>

In his motion to vacate, Petitioner claimed that Davis' deficient performance caused Petitioner to receive a life sentence because Davis "failed to inform [Petitioner] of [the] difference between having a trial or pleading guilty, and also the futility of going to trial to only fight the enhancements." [CV Doc. 1 at 5, 7]. Petitioner claimed that "[h]ad defense counsel explained to [Petitioner] that it was in his best interests to plead guilty and argue against the enhancements at sentencing, more than likely [Petitioner] would have pled guilty and accepted responsibility similar to his co-defendants." [CV Doc. 1-1 at 8]. Petitioner, however, did not claim – until his reply brief – that he was willing to plead guilty, but that Davis advised him not to. [See CV Doc. 8 at 16].

The Court remains convinced that Petitioner received effective assistance of counsel during plea negotiations in this case. Petitioner has made numerous claims here that undermine his credibility in the first instance. Petitioner specifically testified to never having seen the First and Fourth Plea Offers. The Court finds this testimony unbelievable. If nothing else, the First Plea Offer was discussed at length during the reverse proffer. Petitioner acknowledged participating in the reverse proffer and remembered that the Government reviewed the facts and expected testimony of witnesses. Davis testified that he reviewed the First Plea Offer with Petitioner in detail before the reverse proffer after having provided Petitioner with a copy of it. Petitioner also testified that he recalled reviewing the modified factual basis that corresponded with the Fourth Plea Offer, but he asks the Court to believe that he never saw the Fourth Plea Offer itself. Petitioner also claims that he never saw a plea offer that contained a capped drug amount, which would also capture the Second Plea Offer. This is particularly incredible where Petitioner testified that, at the time he allegedly wrote the February 2017 letter, he had seen "at least four" plea offers. As such,

it seems Petitioner asks the Court to believe that he saw at least three plea offers that are not in the record but did not see three of the four plea offers that are in the record. This simply is not credible.

Petitioner maintains that he believed, based on Davis' advice, that he had to go to trial to fight sentencing enhancements. The Court finds this claim incredible. The plain language of every plea offer negates this argument. All plea offers in the record include a paragraph reserving the parties' rights to argue their respective positions regarding enhancements at sentencing. Moreover, the plea offers initially contained joint recommendations whereby the parties reserved their right to argue at sentencing whether Petitioner should receive the 2-level weapon and leadership role enhancements. Moreover, Davis testified that he never told Plaintiff that he had to go to trial to fight enhancements. Rather, Davis advised Petitioner that he could preserve his right to object to the enhancements and challenge them at sentencing. Davis, a very experienced federal criminal defense attorney, credibly testified that he was well aware that sentencing enhancements could be challenged at sentencing without first pursuing a trial, and would not have provided any advice to the contrary. It seems more likely based on the record before the Court that Petitioner simply believed he should not be responsible for the enhancements and proceeded to trial, at least in part, to avoid their application through a not guilty verdict.

Also troubling is Petitioner's claim that he proceeded to trial to fight enhancements solely based on misadvise by Davis, while also testifying that the "whole issue" preventing him from pleading guilty was the Government's refusal to put a cap on the drug amount. Both these things cannot be true. Adding to the Court's skepticism here are Petitioner's conflicting positions on cooperation. In his reply brief, Petitioner suggests that Davis told him not to plead guilty out of fear for Petitioner's family given the dangers of today's drug cartel. Petitioner testified, however, that he was not afraid for himself or his family, and that he did not want to cooperate because the

Government was asking him questions he "didn't know nothing about." Regardless, at Petitioner's request, no substantial assistance language appeared in the any of the proposed plea offers and Davis credibly testified that it was "obvious" why Petitioner did not want such language in a plea agreement.

Finally, bearing on Petitioner's credibility, Petitioner points to this February 17, 2017 letter that did not appear in the record until attached to Petitioner's reply brief, when Petitioner also first claimed that Davis advised him not to plead guilty. Davis testified that he had never seen that letter, did not have it in his files, and that the substance of the letter was outside the nature and scope of his previous communications with Petitioner.

Only after the benefit of the Government's response did Petitioner claim that Davis told him not to plead guilty or produce the February 2017 letter calling Davis' alleged advice into question. Moreover, Petitioner was advised of the option of pleading guilty and preserving his right to challenge the sentencing enhancements as part of every plea deal offered to and rejected by him. The record also shows that Petitioner had his first attorney removed for trying to force Petitioner to plead guilty. He now inconsistently argues that he would have followed the same such advice if propounded by Davis.

On the other side, Davis spent considerable time and energy negotiating several consecutively more favorable plea offers for Petitioner. Davis also spent considerable time and energy discussing and explaining the terms of these plea offers, visiting Petitioner in custody more than ten times. Davis explained the potential application of the sentencing enhancements to Petitioner and Petitioner consistently maintained that they did not apply. Davis credibly testified that he advised Petitioner on the pros and cons of proceeding to trial over taking a plea and that proceeding to trial involved "many more cons." The Fourth Plea Offer, which Petitioner claims

not to have seen despite admitting to having seen the corresponding modified factual basis, changed the statutory maximum to 20 years and removed the mandatory minimum sentence. Petitioner, nonetheless, in the face of this highly favorable plea, refused to plead guilty and pressed forward to trial.

Petitioner's claim that he did not know why Davis did not want him to take a plea, but that Petitioner nonetheless followed this advice is also incredible. Petitioner was obviously actively engaged in his defense and caused Davis to negotiate a plea deal more times than ever before in his career. Petitioner simply rejected deal after deal. Ultimately, when considering Petitioner's various, sometimes conflicting, claims and testimony at various phases of these proceedings, together with Davis' credible testimony at the hearing in this matter, the Court finds that Petitioner's claim of ineffective assistance of counsel during plea negotiations is unsupported by credible evidence.

As such, the Court concludes, after conducting an evidentiary hearing in this matter, that Petitioner has failed to show deficient performance by counsel relative to plea negotiations before trial. See Strickland, 466 U.S. at 687-88. The Court, therefore, will dismiss this claim.

IV.    **CONCLUSION**

For the foregoing reasons, the Court denies and dismisses Petitioner's Section 2255 Motion to Vacate with prejudice on the sole issue before the Court on remand.

Pursuant to Rule 11(a) of the Rules Governing Section 2254 and Section 2255 Cases, this Court declines to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 338 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 473, 484 (2000) (when relief is denied on

procedural grounds, a petitioner must establish both that the dispositive procedural ruling is debatable and that the petition states a debatable claim of the denial of a constitutional right).

**IT IS, THEREFORE, ORDERED** Petitioner's Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255 [Doc. 1] are **DENIED** and **DISMISSED WITH PREJUDICE** on the claim of ineffective assistance during plea negotiations.

Signed: January 30, 2023

Kenneth D. Bell
United States District Judge